IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

SHANNON OWENS, an individual,     Case No.:

    Plaintiff,

v.

UNIVERSITY OF MIAMI,
a Florida Not For Profit Corporation,

    Defendant.
_____/

## COMPLAINT

Plaintiff, SHANNON OWENS, by and through undersigned counsel in the above-styled cause, hereby files this Complaint for Damages and Demand for Relief against Defendant, University of Miami, a Florida Not For Profit Corporation, and alleges as follows:

## PARTIES

1. Plaintiff Shannon Owens ("Plaintiff" or "Owens") is a natural person and a resident of Broward County, Florida, and is otherwise *sui juris*.

2. Defendant University of Miami ("Defendant" or the "Hospital") is a Florida Not For Profit Corporation organized and existing under the laws of the State of Florida, with its principal place of business at 1320 South Dixie Highway, Suite 1200, Coral Gables, Florida 33146, and is otherwise *sui juris*.

## JURISDICTION AND VENUE

3. This court has subject matter jurisdiction pursuant to section 34.01, *Florida Statutes*, because this is an action for damages exceeding $50,000 exclusive of interest, costs, and attorney's fees.

4. This Court has personal jurisdiction over Defendant because it is domiciled in Florida at 1320 South Dixie Highway, Suite 1200, Coral Gables, FL, 33146.

5. Venue is appropriate in this jurisdiction under sections 47.011 and 47.051, *Florida Statutes*, because: (1) the Defendant resides in Miami-Dade County; and (2) the cause of action accrued in Miami-Dade County.

6. All conditions precedent to the maintenance of this action, including exhaustion of administrative remedies, have been performed by Plaintiff, have occurred, or have been waived by Defendant.

## FACTUAL ALLEGATIONS

### Background

7. The University of Miami Health System, dubbed "UHealth," is a university-based medical system made up of more than 1,800 providers and scientists who provide medical care to the South Florida community.

8. The UHealth Tower is the University of Miami's self-proclaimed flagship of the University of Miami Health System. Located in the heart of Miami's health district, UHealth Tower features more than 500 private rooms and utilizes the most advanced technologies available.

9. On or around September 15, 2021, Owens began working as a Unit Secretary for the Hospital at its UHealth Tower location.

10. To ensure patient and staff safety and help prevent the spread of COVID-19 during the pandemic, the Hospital maintained a facemask policy that applied to all staff, including Owens.

*[THIS SPACE LEFT INTENTIONALLY BLANK]*

**Owens is a Person with a Disability[1]**

11. Owens has a severe contact allergy to latex, irritants, and elastic components. She also has chronic, panic-inducing claustrophobia.

12. When latex and certain irritants trigger Owens' allergy, it severely inhibits her ability to breathe.

13. The extent of Owens' allergies is so severe that Owens was compelled to keep an Albuterol Inhaler and two (2) EpiPens in her work locker to avoid going into anaphylactic shock should an emergency arise.

14. Accordingly, Owens is a qualified individual with a disability.

**The Hospital Granted Owens an Accommodation**

15. On or around September 26, 2021, Owens disclosed her contact allergy, latex allergy, and related health issues to the Hospital through her supervisor, Beatriz Rojas ("Rojas").

16. After providing a medical doctor's note, Rojas granted Owens an informal accommodation by allowing Owens to wear a fabric facemask instead of a facemask containing latex and elastic components.

17. Thereafter, Owens wore the fabric facemask until late December 2021 without issue.

**The Hospital Changes its Mask Policy to Owens' Detriment**

18. In response to the surging Omicron variant, in late December 2021, the Hospital sought to update its employee mask policy.

---

[1] Although the Florida Civil Rights Act ("FCRA") prohibits discrimination based upon handicap, "the FCRA does not define the term 'handicap.'" *Byrd v. BT Foods, Inc.*, 948 So. 2d 921, 926 (Fla. 4th DCA 2007). In construing the FCRA, courts "look to the [Americans with Disabilities Act's] definition of a 'disability.'" *Id.* Accordingly, reference to the terms "disability" and "handicap" herein are used interchangeably.

19. The new mask policy was slated to go into effect on December 29, 2021.

20. The new mask policy required employees to wear N95 respirators at all times.

21. Many N95 models, including those non-hypoallergenic models supplied by the Hospital, contain latex in the straps and irritants inside the facemask leftover from production of the facemask.

22. "Wearing an N95 respirator can make it harder to breathe." *See How to Use your N95® Respirator*, CDC (May 16, 2023), https://www.cdc.gov/niosh/topics/publicppe/use.html.

23. On December 28, 2021, after hearing whispers about the forthcoming new mask policy, Owens checked in with her manager.

24. Facing the prospect of a serious allergic reaction coupled with a mask that makes it more difficult to breathe—a life-threatening combination—Owens asked her manager whether, consonant with the Hospital's earlier informal accommodation, she would be provided with a commercially available, hypoallergenic N95 mask.

25. Unsure, Owens' manager told Owens to be a "team player" and simply wear the N95 mask over the fabric mask, starting immediately.

26. Owens did as her manager instructed. Within an hour, Owens' eyes became swollen and started burning and tearing. Owens' face and neck were covered in hives, her throat became tight, itchy, and sore, and she started wheezing, coughing, and congesting.

27. As a result of her manager's instruction, Owens was forced to use her Albuterol Inhaler.

28. On December 29, 2021, the Hospital officially rolled out its new mask policy, mandating all employees wear standard-issued N95 masks containing latex. The new mask policy made no exceptions for employees like Owens with disabilities.

29. Although it took Owens several days to fully recover from the severe allergic reaction she experienced as a result of wearing the N95, she still showed up for work on December 29, 2021.

30. When Owens showed for work, she was informed that all employees, including her, were *required* to wear the N95 masks.

31. Owens explained her need for a hypoallergenic mask to accommodate her disability. Owens further elaborated: she was not trying to be difficult or avoid wearing a mask; she merely needed a hypoallergenic mask to avoid another adverse and potentially life-endangering allergic reaction.

32. Owens' night manager was blunt, offering Owens a classic Hobson's choice: place her life in danger by wearing the N95 mask, or leave.

33. The choice, though hers, was no choice at all. Owens clocked out and left work.

34. Indeed, fearing another disability-related and life-threatening reaction to the N95 mask, Owens put her health, safety, and life above the Hospital's unforgiving and unaccommodating policy.

35. As required, Owens contacted her nursing manager prior to leaving. Owens explained to the nursing manager her need for a hypoallergenic mask and her concern about being removed from the work schedule.

36. Owens left with the impression that she would soon return to work with the hypoallergenic mask accommodation she requested. Owens was mistaken.

**Owens Requests a Formal Accommodation**

37. For several days, Owens persistently called her managers and tried to connect with Human Resources.

38. On January 4, 2022, Rojas contacted Owens. Rojas sought clarification on Owens' inability to wear N95 masks.

39. Owens explained that the N95's contain latex and she could not wear the masks without having a significant allergic reaction.

40. Inexplicably, Rojas disagreed. Not only did Rojas not believe Owens, but Rojas—despite having received medical documentation three (3) months prior—also demanded further medical documentation.

41. Owens, ever the team player, obliged. She set up a second doctor's appointment to placate Rojas' request. She communicated with HR about the proper protocol. And she submitted a formal request for accommodation with updated medical documentation provided by Owens' physician.

42. Because Owens also lives with claustrophobia, she sought accommodations for both of her disabling conditions.

**The Hospital Grants Owens an Alternative Accommodation It Could not Fulfill**

43. On February 10, 2022, the Hospital denied Owens' accommodation request to wear readily available fabric masks, and instead, granted Owens an Alternative accommodation to wear a "Harley NIOSH Approved Hypoallergenic N95 Particulate Respirator Mask."

44. Under the terms of the alternative accommodation, the Hospital mandated Owens return to work within four (4) days or face termination.

45. Once again, Owens did as told and returned to work as mandated.

46. Yet upon her return, the Hospital had no hypoallergenic N95s for Owens to wear.

47. Instead, Owens tried every mask the Hospital had in its possession. All gave Owens allergic reactions.

48. Only one mask—a clear facemask—did not give Owens breathing difficulties. It did, however, cause contact dermatitis, red bumps, welts, itching, and burning.

49. Owens voiced her concerns. As a result, she quickly gained a reputation for complaining.

50. This reputation materialized through hostility and animosity. Owens was routinely made fun of, ostracized, and made to feel like a burden. The charge nurse told her she was not a "team player." Several of Owens' coworkers called her a "princess," "the special white girl," and the "complainer." Her other colleagues refused to acknowledge Owens' existence.

51. Despite being marginalized for her disability, Owens maintained her professionalism. After consulting with Dr. Lamar, the Executive Director of Occupational Health, Safety, and Compliance, Dr. Lamar provided Owens with a few masks from his private stash. He told Owens to "make them last."

**Owens Suffers a Severe Reaction**

52. The masks did not last, and Owens was forced to return to wearing non-hypoallergenic facemasks despite the Hospital granting her an alternative accommodation.

53. On February 27, 2022, Owens—as a result of the prolonged exposure to the non-hypoallergenic facemasks provided to her—experienced difficulties breathing and hives on her face.

54. After repeatedly pulling her facemask away to catch her breath, Owens was forced to use both her Albuterol Inhaler *and* her EpiPen.

55. The charge nurse on duty observed Owens' difficulties breathing and escorted her to the Emergency Room. There, a physical exam concluded with a diagnosis of "posterior oropharyngeal erythema."

56. Owens contacted her supervisor. She explained that she could not return to work without a hypoallergenic facemask. This, the Hospital would not provide.

### The Hospital Forces Owens to Take Personal Leave, Then Terminates Her

57. On or around March 3, 2022, Owens reported the emergency room incident to Dr. Lamar. Owens also informed Dr. Lamar that several CANs and RN's were not wearing the masks the Hospital required her to wear, but rather KN95 masks. KN95 masks were not FDA approved; they were not NIOSH approved; and they were not Hospital approved.

58. In other words, when Owens sought to wear a different facemask than those required by the Hospital as an accommodation for her disability, she was denied, ostracized, ridiculed, called names, and threatened with termination; yet when her non-disabled colleagues sought to wear different facemasks, they were allowed without issue.

59. In her complaint to Dr. Lamar, Owens made clear: she was being singled out in ways her similarly situated non-disabled colleagues were not.

60. All Owens wanted was an accommodation that would not put her health at risk. But rather than provide Owens with the accommodation it had promised, the Hospital instead coaxed Owens into taking unpaid personal leave.

61. Despite Owens' recent hospitalization, and despite the Hospital's refusal to provide her the mask it promised, on March 8, 2023, the Hospital issued her a written reprimand for not showing up to work.

62. Owens understood the writeup for what it was: a manipulative attempt to strongarm her into taking personal leave. The attempt worked.

63. On March 16, 2023, Owens obliged and applied for personal leave through September 7, 2022.

64. On March 22, 2022, the Hospital "granted" Owens the medical leave it forced her to take, but only through April 8, 2023.

65. Curiously, the Hospital also explained to Owens that the personal leave was granted as an accommodation under the ADA.

66. But Owens did not want personal leave; she just wanted a hypoallergenic mask.

67. But requesting a mask—from a hospital—that would not risk her health and safety ultimately proved too much.

68. On July 15, 2022—after advising the Hospital she could not return to work without a hypoallergenic mask—Owens was terminated.

### Owens Seeks Vindication

69. On or around April 26, 2023, Owens dual-filed charges of discrimination and retaliation with the Florida Commission on Human Relations ("FCHR") and the U.S. Equal Employment Opportunity Commission ("EEOC").

70. On or around May 4, 2023, Owens filed an amended charge of discrimination with the FCHR and EEOC.

71. Over one-hundred eighty (180) days have elapsed since the filing of Owens' charge with the FCHR and EEOC. Accordingly, Owens has exhausted her administrative remedies pursuant to section 760.11, *Florida Statutes*, and can thus bring discrimination and retaliation claims under the Florida Civil Rights Act ("FCRA").

72. Accordingly, Owens timely files suit to vindicate her rights under Florida law.

### COUNT I — HANDICAP DISCRIMINATION (Fla. Stat. § 760.10(1)(a))

73. Plaintiff repeats and realleges each and every allegation in Paragraphs 1 through 72 above, as though fully set forth herein.

74. This is an action for violation of the Florida Civil Rights Act ("FCRA"), which provides, in pertinent part: "It is an unlawful employment practice for an employer . . . to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's . . . handicap . . . ." *See* Fla. Stat. § 760.10(a)(1).

75. At all material times hereto, Plaintiff was an Employee of Defendant, and Defendant was an Employer as defined by section 760.02(7), *Florida Statutes*.

76. Plaintiff is a qualified individual with a handicap and, as such, is a member of a protected class under the FCRA.

77. At all times material hereto, Plaintiff was qualified for the position she held.

78. During Plaintiff's employment with Defendant, through the conduct of its agents, servants, and/or employees, Defendant discriminated against Plaintiff with respect to her compensation, terms, conditions, or privileges of employment on the basis of her disability.

79. Specifically, Defendant marginalized Plaintiff and subjected her to adverse employment actions on the basis of her disability while treating her similarly situated non-disabled colleagues more favorably.

80. The adverse employment actions Defendant subjected Plaintiff to include, but are not limited to, the following:

   a) Subjecting Plaintiff to different terms and conditions of employment than non-disabled employees;
   
   b) Intentionally hindering Plaintiff from being able to complete the basic functions of her job;
   
   c) Demeaning, degrading, and emotionally abusing Plaintiff;
   
   d) Retaliating against Plaintiff based on her disability; and

e) Terminating Plaintiff's employment on the basis of her disability.

81. Defendant's actions, as described above, constitute prohibited employment practices in violation of the FCRA.

82. Plaintiff's non-disabled colleagues did not endure the same adverse actions.

83. Even if Defendant had legitimate, non-discriminatory reasons, Plaintiff's disability was, at a minimum, a motivating factor in Defendant's adverse employment decisions.

84. As a direct and proximate result of Defendant's acts as alleged herein, Plaintiff has suffered and continues to suffer substantial economic damages, including but not limited to, loss of earning capacity, back pay and front pay, past, present, and future income, loss of retirement benefits, compensatory damages, lost wages and other employee benefits, all to her detriment, in an amount to be shown according to proof.

85. As a direct and proximate result of Defendant's unlawful retaliatory actions, Plaintiff has suffered shock, anger, shame, embarrassment, humiliation, hurt feelings, mental anguish, loss of capacity for the enjoyment of life, ongoing sadness, nausea, nightmares, irritability, nervousness, anxiety, loss of confidence, grief, sleeplessness, hopelessness, fear, loss of self-esteem, and other emotional distress, all to her general damage in an amount to be determined according to proof. These losses are either permanent or continuing in nature, and Plaintiff will continue to suffer these losses in the future.

86. Defendant committed the acts alleged herein despicably, maliciously, fraudulently, and/or oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice and in willful and conscious disregard of Plaintiff's rights. Plaintiff, pursuant to section 760.11(5), *Florida Statutes*, is entitled to recover punitive damages from

Defendant in the amount of one hundred thousand dollars ($100,000.00) without first seeking leave of court.

87. Plaintiff, pursuant to section 760.11(5), *Florida Statutes*, is also entitled to recover reasonable attorney's fees and costs of said suit in an amount to be shown according to proof.

**WHEREFORE**, Plaintiff, SHANNON E. OWENS, demands judgment against Defendant, UNIVERSITY OF MIAMI, for damages, costs, interest, reasonable attorney's fees, and any further relief the Court may deem just and proper under the circumstances.

### COUNT II — RETALIATION (Fla. Stat. § 760.10(7))

88. Plaintiff repeats and realleges each and every allegation in Paragraphs 1 through 72 above, as though fully set forth herein.

89. This is an action for violation of the Florida Civil Rights Act ("FCRA"), which provides, in pertinent part: "It is an unlawful employment practice for an employer . . . to discriminate against any person because that person has opposed any practice which is an unlawful employment practice under this section . . . ." *See* Fla. Stat. § 760.10(7).

90. At all material times hereto, Plaintiff was an Employee of Defendant, and Defendant was an Employer as defined by section 760.02(7), *Florida Statutes*.

91. Plaintiff is a qualified individual with a disability and, as such, is a member of a protected class under the FCRA.

92. During Plaintiff's employment with Defendant, through the conduct of its agents, servants, and/or employees, Defendant retaliated against Plaintiff after she made a protected complaint regarding discrimination on the basis of her disability.

93. More specifically, Plaintiff opposed Defendant's discriminatory practices against her on the basis of her disability.

94. Immediately after Plaintiff's protected complaints, Defendant wrongfully and illegally retaliated against Plaintiff in violation of section 760.02(7), *Florida Statutes*, when it:

    a) Subjected Plaintiff to different terms and conditions of employment than non-disabled employees;

    b) Intentionally hindered Plaintiff from being able to complete the basic functions of her job;

    c) Demeaned, degraded, and emotionally abused Plaintiff;

    d) Forced Plaintiff to take unpaid personal leave in lieu of providing a low-cost and reasonable accommodation; and

    e) Terminated Plaintiff's employment on the basis of her disability.

95. As a direct and proximate result of Defendant's acts as alleged herein, Plaintiff has suffered and continues to suffer substantial economic damages, including but not limited to loss of earning capacity, back pay and front pay, past, present, and future income, loss of retirement benefits, compensatory damages, lost wages and other employee benefits, all to her detriment, in an amount to be shown according to proof.

96. As a direct and proximate result of Defendant's unlawful retaliatory actions, Plaintiff has suffered shock, anger, shame, embarrassment, humiliation, hurt feelings, mental anguish, loss of capacity for the enjoyment of life, ongoing sadness, nausea, nightmares, irritability, nervousness, anxiety, loss of confidence, grief, sleeplessness, hopelessness, fear, loss of self-esteem, and other emotional distress, all to her general damage in an amount to be determined according to proof. These losses are either permanent or continuing in nature, and Plaintiff will continue to suffer these losses in the future.

97. Defendant committed the acts alleged herein despicably, maliciously, fraudulently, and/or oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motive amounting to malice and in willful and conscious disregard of Plaintiff's rights. Plaintiff, pursuant to section 760.11(5), *Florida Statutes*, is entitled to recover punitive damages from Defendant in the amount of one hundred thousand dollars ($100,000.00) without first seeking leave of court.

98. Plaintiff, pursuant to section 760.11(5), *Florida Statutes*, is also entitled to recover reasonable attorney's fees and costs of said suit in an amount to be shown according to proof.

**WHEREFORE**, Plaintiff, SHANNON E. OWENS, demands judgment against Defendant, UNIVERSITY OF MIAMI, for damages, costs, reasonable attorney's fees, and any further relief the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

As to each count, Plaintiff, SHANNON OWENS, hereby demands a trial by jury on all issues so triable.

Dated this 1st day of November 2023.

Respectfully submitted,

By: */s/ Reid Levin*
Reid Levin, Esq.
Florida Bar No. 1038933
**Reid Levin, PLLC**
P.O. Box 880682
Boca Raton, Florida 33488
Phone: (561) 866-6089
Email: reid@reidlevinpllc.com

***Attorney for Plaintiff Shannon E. Owens***